

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-10-00481-CV

JEFFERY A. BELL AND WANDA E. BELL

APPELLANTS

V.

KENDALL BENNETT AND KRB CONSULTING, LLC

APPELLEES

----------

**AND**

### NO. 02-11-00057-CV

JEFFERY A. BELL AND WANDA E. BELL

APPELLANTS

V.

GARY CHERRY AND PREMIERE, INC.

APPELLEES

----------

**AND**

### NO. 02-11-00063-CV

JEFFERY A. BELL AND WANDA E. BELL                                    APPELLANTS

V.

CARRIZO OIL & GAS, INC.                                              APPELLEE

----------

FROM THE 271ST DISTRICT COURT OF WISE COUNTY

----------

**MEMORANDUM OPINION**[1]

----------

## I. INTRODUCTION

On the court's own motion, the above causes are hereby consolidated for purposes of disposing of these related summary judgment appeals in a single opinion. Each cause shall continue to bear its respective cause number.

Appellants Jeffery A. Bell and Wanda E. Bell appeal from the trial court's grant of summary judgments in favor of Appellees[2] disposing of the Bells' claims for defamation, intentional infliction of emotional distress (IIED), civil conspiracy,

----------

[1]*See* Tex. R. App. P. 47.4.

[2]For ease of reference, the five defendants involved in this consolidated appeal will be referred to as "Appellees" when discussed as a group. To the extent that the consolidated appeals need to be referred to individually, they will be denoted as "the Bennett/KRB appeal," "the Cherry/Premiere appeal," and "the Carrizo appeal."

gross negligence, and loss of consortium; the Bells had alleged these same claims against twenty-eight defendants after Jeff was terminated from his oil field sales job with Express Energy. In essence, the Bells' claims are a house of cards built on allegations of defamation and on stacked inferences purportedly asserting a kickback scheme.[3] The Bells' house of cards collapses because no evidence exists supporting their defamation claims against any Appellee and because any inferences concerning a kickback scheme are not relevant. Because no evidence exists of a defamatory statement published by any Appellee, no foundation exists to support any of the Bells' claims, and we will affirm the trial court's grant of summary judgment for Appellees on all of the Bells' claims.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Jeff claims that he was terminated from Express Energy because he was defamed by Appellees. He claims that Appellees conspired against him because he would not participate in an alleged kickback scheme and that Appellees intentionally inflicted emotional distress on him. The kickback scheme that Jeff

---

[3]*See Republic Nat'l Bank of Dallas v. Eiring*, 240 S.W.2d 414, 416 (Tex. Civ. App.—Amarillo 1951, no writ) (stating that "Appellant's theory above outlined is a house of cards based solely upon the primary assumption that the lease to Kingwood Oil Company is upon the Northeast ¼ of Section 22, Block D-5" and that "[t]he fallacy of appellant's theory is shown by checking the Kingwood Oil Company lease wherein it is found that such lease does not in fact cover the Northeast ¼ of Section 22, Block D-5 . . . ."); *see generally Melancon v. State*, 66 S.W.3d 375, 387 n.3 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd) (stating that "[h]ere, the house of cards is even more tenuous; an inference is based upon another inference, upon another and yet another").

3

attempts to weave together through inferences he draws from a variety of facts is not relevant to any element of his underlying defamation claim and is not supported by the record. *See generally* Tex. R. Evid. 401 (explaining that relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence). Thus, in our factual background, we omit most of the facts from which Jeff attempts to draw inferences to show a kickback scheme. The facts recited below simply provide a relational framework of the connection between the various individuals and companies here; facts relating to other individuals or entities that were sued but that are not involved in these appeals are omitted if not relevant to the issues involved here. Conflicting summary judgment evidence exists on some nonmaterial facts—such as which companies particular individuals worked at during a particular time—thus, our opinion contains some nonmaterial factual conflicts.

## A. Jeff's Deposition Testimony

Jeff worked in oil field sales for various companies. As part of these jobs, Jeff interacted with "company men"[4] at various rigs as he attempted to sell different types of oil field services for his then current employer—either Frank's Casing, Premiere, or Express Energy.

---

[4]Jeff explained that the company man made decisions regarding who "he was going to use to do whatever type of work was going to be done."

## 1. Frank's Casing

While employed by Frank's Casing, Jeff met Appellee Kendall Bennett. Bennett was a company man at one of the rigs Jeff called on, and Bennett split shifts with Mike Barton. Bennett testified that Jeff was a liar who had "played" Bennett and his relief, Barton, off one another by telling Bennett that Barton had promised Jeff the casing job and telling Barton that Bennett had promised Jeff the casing job. During Jeff's deposition, he was questioned about this incident:

Q    So when you first met Mr. Kendall Bennett, I would assume that your intent was to try and get some work at that rig, right?

A    Yes, sir.

Q    And when you say "work," you are talking about Frank's Casing, casing work, right?

A    Yes, sir.

Q    Okay. And do you remember a conversation with Mr. Barton in which you told him that Mr. Bennett had promised you that you could do the work on the site?

A    No, sir.

Q    Okay. Do you remember any conversation with my client, Kendall Bennett, in which he basically told you that he felt that you had misrepresented an agreement that you had with Mike Barton, and that he didn't want you working -- that he didn't want you coming back out to his site?

A    No, sir.

Q    Never happened?

A    Not that -- not that I can remember it never happened.

Q    Okay.  So as we sit here today, you can't remember that happening?

A    It didn't happen.

Q    Didn't happen?

A    Didn't -- I don't remember it happening.  As far as I know, it didn't happen.

Q    Okay.  Again, I'm not trying to fuss with you, but when someone tells me they don't recall it happening, that tells me that it's a possibility it happened, their memory just may not remember it.

A    I guess that's --

Q    Is that what we are saying today?

A    Yeah.

Q    Okay.  So it's possible it happened, you just don't -- as we sit here today under oath, you can't testify that you recall it, correct?

A    Correct.

Q    Okay.  So if Mr. Bennett comes in and Mr. Barton comes in and testifies to this jury that it did happen, you are just in a situation where you say you don't remember it, but you are not denying that it did, correct?

A    Correct.

Also while Jeff was working at Frank's Casing, Jeff said that he purchased a trailer and that the purchase had been approved by the advertising department. His boss did not think that Jeff had received approval and thought that Jeff had misappropriated funds.  But Jeff said that he later received a letter stating that it was a misunderstanding and that "it was all taken care of."

6

Jeff later left Frank's Casing, stating that Appellee Premiere had offered him a job making more money and had "talked like it was a different type of environment." Jeff said that he was not aware that Frank's Casing had written on his termination report: "REASON FOR TERMINATION (STATE DETAILS AND ATTACH SUPPORTING DOCUMENTS): Paid very little attention to detail. Did not keep up with customers. Worked when wanted to. Talked in circles. . . . Didn't take care of his job very well. . . . MISC. REMARKS: Poor salesman." Jeff's perspective was that his supervisor was disappointed that he was resigning and tried to convince him to continue working for Frank's Casing.

## 2. Premiere

Jeff said that Appellee Gary Cherry, an oil field salesman with Premiere, had suggested that he come to work at Premiere. According to Jeff, Cherry became upset with Jeff when Jeff spoke to one of Cherry's customers about a mistake that Cherry had made. Jeff claimed that he had been asked to go talk to the customer. Cherry nonetheless complained to Jeff's boss and also told Premiere's vice president, Jim Williams, that Jeff was trying to steal his work.

While Jeff was working at Premiere, a woman named Marilyn H. who was a Premiere employee made sexual harassment allegations against him. Jeff said that Cherry brought up the sexual harassment issue involving Marilyn H. at one of the company's functions. Jeff explained that Cherry was talking to him and that when Cherry saw that others were nearby, he said that he would talk to Jeff

7

about it later.  Jeff considered what Cherry had said to be defamatory because it was not said one-on-one in an office.

Jeff said that shortly thereafter, when he had been with Premiere for a year, he received a phone call from vice president Jim Williams, who stated that Jeff's services were no longer needed; no details were provided.[5]  Jeff was hired at Express on the same day that he was fired from Premiere.

### 3. Express

Jeff testified during his deposition that he had told Ricky Wiggins, the district manager for Express, during his initial interview with Express about Marilyn H.'s sexual harassment allegations and that he had been accused of misappropriating company funds for a trailer while he was at Frank's Casing.

After Jeff started working at Express, Wiggins and general manager Randy Davis told him to go by every rig to see if they had a sales representative and to inquire whether he or she was doing a good job.  Jeff met with Wiggins weekly to provide updates on whom he had called on during the previous week and to recount the feedback that he had received.  During those meetings, Wiggins told Jeff that he was doing a good job.

---

[5]Approximately one month after Jeff was fired from Premiere, he went to pick up his last paycheck.  Jeff claims that he spoke with Chris Meche who told him that Premiere employees Cherry and Jim Reposa had been trying to get rid of him for a year.  Jeff said that Reposa told Jim Williams that Jeff had stolen work from him; Jeff claimed that Reposa had in fact reassigned certain rigs to him.  Jeff was not told by Jim Williams that during the previous year Jeff had been the lowest income producer for the district.

Whenever Jeff as a representative of Express called on Bennett, Jeff thought they had a good visit and recalled selling Bennett a job. Jeff believed that Bennett worked for Denbury at the time.

### 4. The Termination

Jeff was fired one month after he started working at Express. The "Personnel Action Form" documenting Jeff's employment termination states that the reason for Jeff's discharge was that "Jeff['s] salesmanship has not shown to be beneficial to Express Energy or him[]self. Several customer[s—]Quicksilver[,] Denbury[, and] Chesapeake[—] prefer not to have him. Could be personal issues or previous employer slander issues!" Jeff said that Wiggins went over the personnel action form with him but that the reason for his termination did not ring true because he had brought in several jobs during the month that he was with Express.

Wiggins wrote on Jeff's termination paperwork that Quicksilver, Denbury, and Chesapeake had made complaints about Jeff and that there was previous employer slander.[6] When Jeff asked Wiggins what was said about him and who said it, Wiggins said that it was a guy who had previously worked for New Tech

---

[6]Jeff admitted that Wiggins did not make a defamatory statement when he told Jeff that he liked his work but that they had made a decision based on what was written on the personnel action form. And Jeff had no knowledge of Wiggins's making any slanderous statements about Jeff to anyone else.

and Quicksilver and was currently working for Carrizo Oil & Gas.[7] Jeff asked if the person was Dickey Pate, Jr., and Wiggins smiled and changed the subject. Jeff said that he inferred from Wiggins's body language that Pate, Jr. was the person who had made the slanderous statements that had resulted in Jeff's firing from Express.

Jeff believed that Pate, Jr. had made the statement because a friend who Jeff said worked for Carrizo had told Jeff that Pate, Jr. was the only person he knew who had made the jump from Quicksilver to New Tech to Carrizo. Additionally, Jeff had talked with Pate, Jr. at one of the rigs, and Pate, Jr. had referenced that he was glad that Marilyn H. was not there. During that conversation, Jeff and Pate, Jr. were the only two people present, and Jeff presumed that Cherry must have told Pate, Jr. about the Marilyn H. issue.

In his deposition, Jeff initially testified that Wiggins never said that Pate, Jr. had made slanderous statements against Jeff. Jeff later testified that Wiggins in fact had told him that Pate, Jr. had called and had made accusations that caused Jeff to lose his job, that the accusations were very serious, and that Jeff should see an attorney.

Jeff testified that Wiggins said during Jeff's exit interview that Cherry or Pate, Jr. had made some statements about Jeff, but Wiggins did not say what the statements were. Jeff testified that he did not believe Wiggins's deposition

_____

[7]Jeff believed that Wiggins's explanation described the employment history of a man named Dickey Pate, Jr.

10

testimony that he had never heard anything negative about Jeff from Cherry; Pate, Jr.; or Premiere.

Jeff said that he believed he was terminated from Express (1) due to statements that Cherry and Pate, Jr. had made to Wiggins and (2) due to employees of Express feeling threatened when Jeff questioned a kickback scheme that he thought Express salespeople utilized to obtain business from certain company men, including Bennett and a company man at ConocoPhillips. Jeff believed that all of the Appellees had conspired in some form or fashion to get him fired from Express because he had knowledge of the kickback scheme and was not willing to participate in it. Jeff admitted, however, that under the Express employee handbook, an employee could be terminated for unsatisfactory work performance and/or conduct. And Jeff agreed that if a salesman was pitting a night company man against a day company man to gain business, that would constitute grounds for firing that salesman. Jeff, however, denied engaging in such conduct because it would "bite you in the seat" and was unethical.

According to Jeff, after he was fired, Wiggins told him that Bennett did not want him back on Bennett's rig, but Wiggins did not go into any detail. Jeff believed that Bennett had called Express to complain about Jeff two or three days before Jeff was terminated. Jeff conceded, however, that the "previous employer slander" mentioned on his personnel action form was not made by Bennett. Jeff did not know what Bennett had said that had caused Jeff to lose

11

his job.  Jeff also did not know what allegedly defamatory statements the other Appellees had made that Jeff claimed Bennett had negligently accepted and relied on.

## B.  Bennett's Deposition

As a well site supervisor/consultant for Denbury, Bennett had the authority to hire whatever vendor might be needed to perform a job.  And Bennett chose not to use Jeff.

Bennett remembered Jeff "[a]s a liar."[8]  He recalled that when Jeff was with Premiere, he came out to the rig and he "played" Bennett and his relief (Mike Barton) by telling Barton that Bennett had said that Jeff could have the casing job and vice versa even though Bennett had not said that Jeff could have the casing job.  Bennett said that Jeff got caught in the lie and was told to leave.

Bennett said that a year and a half passed before Jeff came into his office on behalf of Express.  Bennett reminded Jeff that Jeff had lied to him before and told Jeff to leave and to not return because he was not welcome.  Jeff left. Bennett then picked up the phone and called Express and told either David,

---

[8]Bennett stated that Jeff lied when he said that Bennett had participated in a kickback scheme by illegally receiving a Harley Davidson and a 2006 Mustang. And although Jeff's sales call notes indicated that Jeff had visited Bennett several times, Bennett said the visits documented were lies.

12

Joey, or Richard/Ricky[9] that he did not want Jeff back on his location because of what Jeff had done in the past when he was with another company.

Before this lawsuit, Bennett had never heard anything derogatory about Jeff. In his affidavit, Bennett stated that he had never heard from anyone at any time that Jeff was a sexual predator, assailant, or harasser and had never heard from anyone that Jeff had committed theft or fraud. He also stated that he was unaware of any plan or agreement to terminate Jeff; he simply did not want Jeff at his jobsite based on his past personal experience with Jeff and what he perceived as a lie by Jeff.

### C. Wiggins's Deposition

Wiggins, the district manager for Express, said that Jeff made a few sales for Express after he was hired, but then Wiggins started receiving complaints about Jeff. Wiggins followed-up on the complaints with phone calls.

Wiggins believed that Bennett had made one of the earlier complaints, requesting that Express send someone else to his rig because he had encountered problems with Jeff on prior jobs. Bennett did not specify what the problems were but gave Wiggins the impression that the problems were related to a sensitive issue.

---

[9]These individuals are unidentified in the record. During his deposition, Bennett did not recall that in his affidavit he had stated that he had spoken with Richard Wiggins at Express.

13

Wiggins could not recall the names of the company men at Quicksilver, Denbury, or Chesapeake who had complained about Jeff, but all three customers said that they preferred not to have Jeff at their rig site. Chesapeake did not want Jeff on site because he had made mistakes and had "issues outstanding" when he had worked for Premiere and Frank's Casing; Wiggins, however, did not know what mistakes Jeff had made that Chesapeake was critical of, nor did Wiggins know "what the specific issue was when he [Jeff] worked for Premiere or Frank's Casing." Two people from Denbury told Wiggins that they preferred not to have Jeff at their location. Wiggins could not recall who from Quicksilver had told him that he would prefer a different salesman.[10] Wiggins reassigned Jeff to other areas after the complaints came in, but Jeff did not get any new sales for Express.

Wiggins told Mike Byrd (vice president of drilling for Express) and Randy Davis (general manager for Express) that Jeff's paperwork was wonderful but that three customers did not want him on location; Wiggins indicated that he did not know the reasons for the customers' decisions. Wiggins also told Byrd and Davis about what Bennett had said. Wiggins stated that the personnel action form came about after Byrd, Davis, and Wiggins decided to fire Jeff. Wiggins

[10]A New Tech employee told Wiggins that while Jeff was with Premiere, Jeff had told three Quicksilver employees that he had been approved for a job at Quicksilver, but none of the three had actually approved him. The three Quicksilver employees figured it out when a piece of equipment broke, and they questioned why they had chosen to use Jeff.

said that their decision was not based on Bennett's comment that the reason he did not want Jeff on the jobsite was sensitive. Wiggins said that Jeff was terminated "for his poor performance on the three customers [Quicksilver, Denbury, and Chesapeake] that he was actually based to achieve work with and maintain good customer relationship with. He didn't have to sell anything. It was given to him."

When asked what might have been affecting Jeff's job performance at Express, Wiggins said that he only knew what Jeff had used as an excuse—"his prior employer's possibly talking slanderish about him in the field." Wiggins said that situation included an ongoing sexual harassment lawsuit. Wiggins said that Jeff did not disclose the sexual harassment action in the initial interview but told Wiggins about it after Wiggins hired him. Wiggins said that Jeff also told him that "the guys over there [at Frank's Casing] were talking bad about him" and that he had been accused of using a barbeque pit or company money for personal use and not returning it. Wiggins said that he first heard about both the sexual harassment lawsuit involving Jeff and about the Frank's Casing allegations of misusing company property or company funds from Jeff.

Wiggins came to the conclusion that either Jeff had personal issues with a lot of company men or that other employers had blemished Jeff's sales ability. Wiggins said that his personal opinion was that the "personal issues" that Jeff had were that "his presentation to a customer would probably get you kicked off a location." Wiggins explained that his note on the personnel action form "could be

15

personal issues" related to Jeff's inability to change with the customers' needs. Wiggins's note about "previous employer slander issues" related to what Jeff had personally told him about his prior employment issues.

Although Jeff listed Wiggins as an eyewitness to the defamatory statements forming the basis of these lawsuits, Wiggins testified that he had no personal knowledge of any negative comments or defamatory statements made about Jeff by Pate (Jr. or Sr.), Cherry, or Premiere. Wiggins said that he had heard from Express salespeople after Jeff left Express that Jeff had been accused of stealing a barbeque pit when he worked for Frank's Casing, of misappropriating funds on a credit card or personal expense account, and of being involved in a sexual harassment case. Wiggins said that Jeff had told "a lot of people" about the sexual harassment case.

### D. Cherry's Deposition

Cherry was a salesman with Premiere from July 2006 to December 15, 2009. Cherry recommended Jeff for the job at Premiere. Jeff rode with Cherry the first three days that he was on the job, and Cherry showed him how Premiere did their sales calls and paperwork. Cherry later heard that Jeff spent a lot of time in making sales calls, wasting the time of company men.

A few days after Jeff started working with Cherry at Premiere, Jeff told Cherry about the accusations he faced at Frank's Casing related to the trailer and barbeque pit. Cherry told Jeff to tell Premiere vice president Jim Williams about the barbeque grill and trailer, and he did so.

16

Cherry said that Marilyn H. mentioned to him that she had experienced "inappropriate verbiage" from a salesman; Cherry said that he did not want to know about it and that she should report it to upper management. Cherry said that he believed that the salesman that Marilyn H. had referred to was Jeff because Jeff also called him about the situation, and he had given Jeff the same advice. Cherry never told anyone about Jeff's issues with Marilyn H.

Cherry made sales for Premiere to Pate, Jr. while Pate, Jr. was at Quicksilver and later at Carrizo. The only conversation Cherry had with Pate, Jr. that mentioned Jeff was when Pate, Jr. told him that he wanted Cherry to do his work, not Jeff. This occurred when Jeff was working for Premiere.

Cherry denied calling Express or contacting Wiggins to complain about Jeff. Cherry reiterated that he had not said anything about Jeff that was negative.

### E. Trial Court's Disposition

After hearing arguments, the trial court granted Appellees' motions for summary judgment. These appeals followed.

### III. SUMMARY JUDGMENT STANDARDS OF REVIEW

### A. No-Evidence Summary Judgment

After an adequate time for discovery, the party without the burden of proof may, without presenting evidence, move for summary judgment on the ground that there is no evidence to support an essential element of the nonmovant's claim or defense. Tex. R. Civ. P. 166a(i). The motion must specifically state the

elements for which there is no evidence. *Id.*; *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009). The trial court must grant the motion unless the nonmovant produces summary judgment evidence that raises a genuine issue of material fact. *See* Tex. R. Civ. P. 166a(i) & cmt.; *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008).

When reviewing a no-evidence summary judgment, we examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion. *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006). We review a no-evidence summary judgment for evidence that would enable reasonable and fair-minded jurors to differ in their conclusions. *Hamilton*, 249 S.W.3d at 426 (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005)). We credit evidence favorable to the nonmovant if reasonable jurors could, and we disregard evidence contrary to the nonmovant unless reasonable jurors could not. *Timpte Indus.*, 286 S.W.3d at 310 (quoting *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006)). If the nonmovant brings forward more than a scintilla of probative evidence that raises a genuine issue of material fact, then a no-evidence summary judgment is not proper. *Smith v. O'Donnell*, 288 S.W.3d 417, 424 (Tex. 2009); *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003), *cert. denied*, 541 U.S. 1030 (2004).

## B. Traditional Motion for Summary Judgment

We review a summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008). A defendant who conclusively negates at least one essential element of a cause of action is entitled to summary judgment on that claim. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010), *cert. denied*, 131 S. Ct. 1017 (2011); *see* Tex. R. Civ. P. 166a(b), (c).

## IV. TRIAL COURT PROPERLY GRANTED SUMMARY JUDGMENT TO ALL APPELLEES ON ALL OF THE BELLS' CLAIMS

The trial court granted summary judgment for Bennett, KRB, and Carrizo on their no-evidence and traditional motions for summary judgment without noting whether it was granting the no-evidence motion or the traditional motion. We therefore analyze the propriety of the summary judgments granted in favor of Bennett, KRB, and Carrizo under the no-evidence standard first. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004) (explaining that when a party moves for summary judgment under both rules 166a(c) and 166a(i), we should

19

review the no-evidence motion first). Cherry and Premiere also filed a no-evidence and a traditional motion for summary judgment. The trial court's order, however, expressly granted Cherry and Premiere's traditional motion for summary judgment. We therefore analyze the propriety of the summary judgment granted in favor of Cherry and Premiere under only the traditional summary judgment standard.

In their first issue, the Bells generally challenge the trial court's grant of summary judgment in favor of all Appellees. In five subissues, the Bells challenge the trial court's grant of summary judgment in favor of Appellees on each of the following claims: defamation, IIED, civil conspiracy, gross negligence, and loss of consortium. The Bells' pleadings indicate that all of their claims hinge on the alleged defamation—that is, the IIED claim is based on the emotional distress that Jeff alleged he suffered as a result of the defamation and its consequences; the civil conspiracy claim is predicated on an allegation of a conspiracy to defame Jeff; the gross negligence claim is based on the alleged tort of defamation; and Wanda's loss of consortium claim is based on the alleged defamation of her husband.

## A. Summary Judgment on Defamation Claims Was Proper

### 1. The General Law Concerning Defamation

"Defamation" is generally defined as the invasion of a person's interest in his or her reputation and good name. Prosser & Keeton on Torts § 111, at 771 (5th ed. 1984 & Supp. 1988). "Defamation" encompasses both libel and slander.

By statute, Texas law defines "libel" as a defamation expressed in written or other graphic form that tends to injure a living person's reputation and thereby expose the person to public hatred, contempt, ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation or to publish the natural defects of anyone and thereby expose the person to public hatred, ridicule, or financial injury. Tex. Civ. Prac. & Rem. Code Ann. § 73.001 (West 2011). Although "slander" is not statutorily defined, at common law, slander is a defamatory statement that is orally communicated or published to a third party without legal excuse. *Randall's Food Mkts*., *Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995). To prevail on a defamation claim, the plaintiff must prove that the defendant (1) published a statement, (2) that was defamatory concerning the plaintiff, (3) while acting with negligence, if the plaintiff was a private individual, regarding the truth of the statement. *See WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998), *cert. denied*, 526 U.S. 1051 (1999).

### 2. Application of the Law to the Present Facts

Here, the Bells pleaded,

> On three separate occasions from August 22, 2008 through September 24, 2008, Defendants told the drilling rig foremen (called "company men" in the trade) of three separate drilling rigs – one rig being operated by Chesapeake – a second rig being operated by Denbury – and a third rig being operated by Quicksilver – that Plaintiff Jeffery Bell was a sexual predator/assailant/harasser while working at his previous employment with Premiere, Inc., and that he committed theft/fraud while working at his previous employment with Frank's Casing.

21

Nowhere in their pleadings, their summary judgment response, or in their brief on appeal, however, do the Bells set forth or identify the alleged defamatory statements that they contend were made or identify who specifically made them. Although Jeff was asked repeatedly in his deposition to identify what allegedly defamatory statements were made and who made them, he repeatedly testified that he did not know what was said or who said it, just that it must have been bad:

> Q     And can you tell me what statement has been made by any of these parties that you are claiming are defamatory, what the statement is?
>
> A     I don't know exactly what the statements, you know, were. I was just told when you see on that piece of paper [the personnel action form that he received when fired from Express] you got a copy of that it was serious enough that it caused me to lose my job and I needed to go see an attorney.

Specifically concerning Bennett, Jeff testified:

> Q  And do you know the reasons these customers preferred not to have you on their rigs and not to have you come by and -- representing Express, try and make sales?
>
> A  No, sir, I do not.
>
> Q  As we sit here today, do you know?
>
> A   Not really, because I had a good working relationship for two years, so I don't know.
>
> Q  Well, you sued my client [Bennett], correct?
>
> A  Yes, sir.
>
> Q  And you sued my client for what reason?

A  Because, obviously, if it's written on a piece of paper that Denbury doesn't want me at their rig, then something had to happen.

Q  All right.

A  I don't know what had happened, and went in and tried to find out what happened.

Through the deposition with Mr. Ricky Wiggins, he just kept using Kendall Bennett and Mike Barton.

Q  Okay.  And what did he say about Kendall Bennett and Mike Barton?

A  I don't remember the exact wording in his deposition, but he kept saying it was because something at -- because of them.

Q  And so that's why you sued my client?

A  Something was said negative enough to cause me to lose my job.

Q  And what was that negative thing that Kendall Bennett said to cause you to lose your job?

A  I honestly don't know.

Q  Okay.  And nobody from Express told you that Kendall Bennett said something negative about you that caused them to terminate you, did they?

A  They told me that Kendall Bennett had called in and said that he didn't want me back at his rig.

. . . .

Q  Okay.  Is that the negative statement, you think?

A  Yeah, it's pretty negative.  When you think you got a good relationship, like me and you talking, and the next thing you know, you don't know that you've offended somebody.  They don't want you back, it's -- you don't know why.

Q  And you still don't know why, do you?

23

A  Huh-uh.

    . . . .

Q  And I've asked you under oath to tell me what slanderous statements my client made about you, and what you've told the jury is all you can say is Mr. Bennett allegedly called your employer and said he didn't want you out on any of his rigs, correct?  Right?

A  That's correct.

    . . . .

Q  Tell me and this jury what the slanderous statements my client made against you were.

I mean, if you don't know, just say you don't know.  But I'd like to know.

A  I really don't know.

Thus, the Bells fail to identify any alleged defamatory statement by any Appellee.

Moreover, during his deposition, Jeff testified that he had disclosed the sexual harassment charges and the Frank's Casing misappropriation allegations to Wiggins immediately after he was hired by Express:

Q  In fact, Mr. Wiggins states that the information about the sexual harassment lawsuit involving you was told to him by you and nobody else.  Do you believe that?

A  I did tell him that before I took the job, because I did not want something to come up and bite me after I got hired.  I felt like full disclosure was the best thing to do.  And if I got hired that way, then I didn't have nothing to worry about.  I didn't want to take the job under false pretenses and someone disclose and lose it.

Q  So are you telling -- are you telling me that you told Mr. Wiggins about the sexual harassment suit before he hired you.

24

A     Yes, ma'am.

. . . .

Q     Okay.  If Mr. Wiggins testified that the allegations of you working at Frank's Casing of using company property or company funds or whatever happened at Frank's Casing, he was only made aware of by you?

A     Correct.  I disclosed everything that happened at Frank's same as I did with Premiere in the interview when I got the job.  And he . . .

. . . .

Q     (By Ms. Kennedy) So if it's your testimony that you were let go because Mr. Wiggins knew of this conversation between Mr. Cherry and Mr. Pate, even though he says he didn't know anything about it, that is what you are basing your lawsuit against Mr. Cherry on; would that be correct?

A     Yes.

. . . .

Q     Okay.  Earlier I believe you testified that you told Mr. Wiggins about Marilyn H[.]'s allegations and also about the allegations of theft from Frank's Casing; is that correct?

A     Yes, ma'am.

Q     Did you tell anyone at Express about that -- those allegations?

A     Well, I think Randy Davis was there and there was the guy over the shop -- I can't think -- Marty -- I can't think of his name.  Like I said, there's three or four of us in there and I disclosed everything. . . .

Thus, the summary judgment evidence establishes that Jeff himself disclosed to Wiggins the very information that he apparently alleges caused him to be fired from Express because it was disclosed to Wiggins by Appellees.

25

The summary judgment evidence, viewed in the light most favorable to Jeff, fails to constitute a scintilla of evidence that any Appellee made a defamatory statement concerning Jeff and, in fact, conclusively negates the existence of a defamatory statement by Appellees. Although the summary judgment evidence establishes that Bennett advised Express that he would not work with Jeff because he had previously been "played" by Jeff and did not feel that Jeff was trustworthy, Jeff himself agreed during his deposition that this statement by Bennett was not defamatory and did not constitute the basis for his defamation claim.

Likewise, the summary judgment evidence establishes that Cherry spoke with Jeff on one occasion at a company function about Marilyn H.'s sexual harassment claim, that Jeff himself had previously told Cherry about that issue, that Cherry halted the conversation at the company event when others approached, and that Cherry said that he had not told anyone about Jeff's issues with Marilyn H.

To the extent that the Bells attempt to hold Carrizo liable based solely on statements allegedly made by Pate, Jr., the summary judgment evidence establishes that Pate, Jr. has never been an employee of Carrizo. And Pate, Jr.'s motion for summary judgment was granted prior to Carrizo's motion being heard; thus, because Pate, Jr. had been granted summary judgment on the defamation claims that the Bells pleaded against him, Carrizo was also entitled to

26

summary judgment on the defamation claims that the Bells pleaded it was vicariously liable for based on Pate, Jr.'s purported statements.

In short, no evidence exists that any Appellee published a defamatory statement about Jeff. Jeff agreed that Bennett's I-don't-want-to-work-with-Jeff statement, which was based on Bennett's personal experience, was not defamatory. No evidence exists identifying a defamatory statement that was made or published by Carrizo or an employee of Carrizo. Cherry and Premiere conclusively negated an essential element of Jeff's defamation claim—the existence of a defamatory statement published by Cherry. Accordingly, we hold that the trial court did not err by granting Bennett and KRB's and Carrizo's motions for no-evidence summary judgment on the Bells' defamation claims or by granting Cherry and Premiere's motion for traditional summary judgment on the Bells' defamation claims. *See Tomlinson v. McComas*, No. 02-11-00175-CV, 2011 WL 5607604, at *8 (Tex. App.—Fort Worth Nov. 17, 2011, pet. filed) (holding that statements regarding how president of homeowners' association presided over matters constituted opinions that were not actionable for defamation). We therefore overrule subissue A relating to the grant of summary judgment to Appellees on the Bells' defamation claims.

### B. Summary Judgment on Intentional Infliction of Emotional Distress Claims Was Proper

In subissue B, the Bells argue that the trial court erred when it granted summary judgment to Appellees on the Bells' claims of IIED. In the

Cherry/Premiere appeal and the Carrizo appeal, the Bells concede that their "IIED claims are not permitted because the Bell[s] have other remedies at law, and therefore, an IIED claim is an impermissible 'gap-filler.'" We therefore overrule the Bells' subissue B as it pertains to Appellees Cherry, Premiere, and Carrizo. We hold that the trial court did not err by granting summary judgment for these Appellees on the Bell's IIED claims.

In the Bennett/KRB appeal, the Bells argue that Bennett and KRB are liable to the Bells for IIED "because the Texas Supreme Court specifically allows IIED claims when an employee is wrongfully terminated by an employer who is engaged in conduct 'bordering on serious criminal acts.'" Specifically, the Bells argue that Bennett and KRB engaged in serious criminal acts when they engaged and participated in the illegal kickback and bribery schemes of Express and that "all of [the] Bell[s'] IIED claims are based on Bennett and KRB's conduct that [constitutes] serious criminal acts or 'bordering on serious criminal acts.'"

As noted above, the Bells' arguments related to any alleged kickback scheme are not relevant to any element of defamation. *See* Tex. R. Evid. 401. And the Bells have not pleaded any other cause of action or tort that would permit their IIED claims. *Accord Stephan v. Baylor Med. Ctr. at Garland*, 20 S.W.3d 880, 892 (Tex. App.—Dallas 2000, no pet.) (stating that "[a]bsent a false and defamatory statement, Baylor's conduct in publishing the report could not be extreme or outrageous as required for an intentional infliction of emotional distress claim"). Because no evidence exists that any Appellee published a

28

defamatory statement concerning Jeff and because the Bells do not allege any other purportedly extreme or outrageous conduct by Appellees, the Bells' IIED claims fail. *See Creditwatch, Inc. v. Jackson*, 157 S.W.3d 814, 816 (Tex. 2005) (stating that IIED is a "gap-filler" tort never intended to supplant or duplicate existing statutory or common-law remedies and that even if other remedies do not explicitly preempt the tort, their availability leaves no gap to fill); *Hoffmann-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 447–48 (Tex. 2004) (stating that "[w]here the gravamen of a plaintiff's complaint is really another tort, intentional infliction of emotional distress should not be available" and citing with approval three defamation cases in which IIED was not available as an independent claim); *see also Brewerton v. Dalrymple*, 997 S.W.2d 212, 216 (Tex. 1999) (holding that the conduct complained of—that defendants made negative comments that were reflected in professor's tenure file, repeatedly recommended that professor should not be allowed to continue on tenure track, restricted his speech regarding contents of his tenure folder, and allegedly assigned him an excessive case load—did not rise to level of extreme and outrageous, and thus, IIED claim failed as a matter of law). We hold that the trial court did not err by granting either no-evidence or traditional summary judgments on the Bells' IIED claims. We overrule the remainder of the Bells' subissue B.

### C. Summary Judgment on Civil Conspiracy Claims Was Proper

In subissue C, the Bells argue that the trial court erred by granting summary judgment to Appellees on the Bells' claims for civil conspiracy.

Appellees respond that there was no evidence of any defamatory statement and that the Bells have not produced any evidence of a conspiracy.

An actionable civil conspiracy is a combination by two or more persons to accomplish a lawful purpose by unlawful means. *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983). The essential elements of a civil conspiracy are (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005); *Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1996); *Triplex Commc'ns, Inc. v. Riley*, 900 S.W.2d 716, 719 (Tex. 1995). It is not the agreement itself but an injury to the plaintiff resulting from an act done pursuant to the common purpose that gives rise to a cause of action for civil conspiracy. *Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 925 (Tex. 1979). In other words, recovery is not based on the conspiracy but on an underlying tort. *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996). Thus, a conspiracy claim is a derivative tort. *Id.*

The Bells alleged that Appellees defamed Jeff as the underlying tort to support their conspiracy claim. But, as explained above, there is no summary judgment evidence of any defamatory statement published by any Appellee. Therefore, the Bells again attempt to interject their contention that an elaborate kickback scheme existed among Appellees, and their theory that because Jeff refused to participate in the scheme, Appellees conspired to have him fired. The

30

kickback scheme was not pleaded as any type of independent tort or cause of action by the Bells, and the summary judgment evidence contains no evidence to support that any two Appellees had a meeting of the minds on any specific object or course of action in furtherance of a conspiracy. *See Miller v. Raytheon Aircraft Co.*, 229 S.W.3d 358, 382 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (concluding that appellant produced no evidence of meeting of minds to perform an unlawful act necessary to establish civil conspiracy claims). We hold that the trial court did not err by granting summary judgment for all Appellees on the Bells' claims for civil conspiracy. *See id.* (holding that trial court properly granted summary judgment on appellant's civil conspiracy claims because there was no evidence of meeting of the minds); *Malone v. Malone*, No. 02-08-00157-CV, 2009 WL 2579629, at *4 (Tex. App.—Fort Worth Aug. 20, 2009, pet. denied) (mem. op.) (holding that trial court did not err by granting brother's no-evidence summary judgment on sister's civil conspiracy claim because sister presented no evidence that brother had engaged in a civil conspiracy to breach any potential fiduciary duty that he owed to sister). We overrule the Bells' subissue C relating to the grant of summary judgment to Appellees on the Bells' civil conspiracy claims.

### D. Summary Judgment on Gross Negligence Claims Was Proper

In the Bells' subissue D, they argue that the trial court erred by granting summary judgment to Appellees on the Bells' claims for gross negligence. The Bells argue that "whether the underlying basis of liability against [Appellees] is

31

defamation or intentional infliction of emotional distress, or civil conspiracy to commit same, the Bell[s'] evidence directly establishes gross negligence." As we held above, no evidence exists that any Appellee defamed Jeff, and no evidence exists of a civil conspiracy among Appellees; thus, there is likewise no evidence to support the Bells' claims for gross negligence. *See, e.g., Rodriguez v. Wal-Mart Stores, Inc.*, 52 S.W.3d 814, 821 (Tex. App.—San Antonio 2001, pet. granted), *overruled on other grounds*, 92 S.W.3d 502 (Tex. 2002) (stating that negligence and gross negligence claims cannot exist independent from malicious prosecution claim and declining to hold that a duty exists outside the torts of malicious prosecution and defamation not to falsely accuse someone of criminal wrongdoing). We overrule the Bells' subissue D relating to the grant of summary judgment to Appellees on the Bells' gross negligence claims.

### E. Summary Judgment on Wanda's Loss of Consortium Claims Was Proper

The Bells argue in subissue E that the trial court erred by granting summary judgment to Appellees on Wanda's claims for loss of consortium. Claims for loss of consortium are derivative. *Motor Express, Inc. v. Rodriguez*, 925 S.W.2d 638, 640 (Tex. 1996); *Whittlesey v. Miller*, 572 S.W.2d 665, 667 (Tex. 1978). Furthermore, loss of consortium damages are recoverable only when the nonderivative claim resulted in physical injury. *Motor Express, Inc.*, 925 S.W.2d at 640; *Browning-Ferris Indus., Inc. v. Lieck*, 881 S.W.2d 288, 294 (Tex. 1994). Because the summary judgment was proper for all Appellees on all

32

of the Bells' pleaded causes of action, Wanda's derivative loss of consortium claims likewise fail. *See Motor Express, Inc.*, 925 S.W.2d at 640 (holding that wife's claims were not recoverable as a matter of law); *see also Brewerton*, 997 S.W.2d at 217 (holding that wife's loss of consortium claim failed because it was wholly derivative of her husband's IIED claim, which the court held failed as a matter of law). We hold that the trial court did not err by granting the no-evidence motions for summary judgment filed by Bennett and KRB and Carrizo and by granting Cherry and Premiere's motion for traditional summary judgment on Wanda's loss of consortium claims. We overrule the Bell's subissue E.

## V. TRIAL COURT DID NOT ERR BY STRIKING BANKRUPTCY EXPERT

In the Bennett/KRB appeal, the Bells raise a second issue—that the trial court erred when it struck their bankruptcy expert witness, bankruptcy trustee William Bonney. The Bells state that "Bonney's expert opinion . . . is that Bennett is guilty of federal bankruptcy crimes as a result of his failure to report bonus income and the acquisition of the 2006 Ford Mustang and the 2002 Harley Davidson motorcycle" and that "Bonney's expert testimony in the bankruptcy area is vital to the Bell's claims that Bennett was intentionally concealing the Harley and the Mustang."

Admissibility of expert testimony is a matter within the trial court's discretion. *K-Mart Corp. v. Honeycutt*, 24 S.W.3d 357, 360 (Tex. 2000); *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995). To determine whether a trial court abused its discretion, we must decide whether the

trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004).

Texas Rule of Evidence 702, which governs the admission of expert testimony, provides, "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." Tex. R. Evid. 702. However, Texas Rule of Evidence 402 states, "Evidence which is not relevant is inadmissible." Tex. R. Evid. 402.

Here, Bonney's expert testimony about Bennett's bankruptcy is not relevant to any element of the Bells' defamation claims. Nor is Bonney's expert testimony about Bennett's bankruptcy relevant to any element of the Bells' other pleaded claims. Because Bonney's expert testimony was not relevant to any of the claims brought by the Bells, we hold that the trial court did not abuse its discretion by striking Bonney as an expert witness. *See Boulle v. Boulle*, 254 S.W.3d 701, 707–08 (Tex. App.—Dallas 2008, no pet.) (holding that trial court properly excluded expert testimony that was not relevant to any ultimate issue before the jury). We overrule the Bells' second issue in the Bennett/KRB appeal.

## VI. CONCLUSION

Having overruled all of the Bells' issues and subissues, we affirm the trial court's judgments.

<br>

SUE WALKER
JUSTICE

PANEL:  GARDNER, WALKER, and MEIER, JJ.

DELIVERED:  March 15, 2012